Good morning, your honors. I'm Daniel Kaplan. I represent the appellant Jesse Quinn Harrison. I'm going to watch the clock and attempt to save about three minutes for my rebuttal. There are two magic numbers in this case, three and four. It took three trials before the government managed to convict Mr. Harrison of making any threats violating 18 U.S.C. Section 871, even though they had him on tape saying to police officers, I'm going to kill the President in two days. And in the final trial when he was convicted, there were four instances during the prosecutor's closing argument where there were misstatements of the subjective intent element of that offense. In the Bagdasarian case this Court held that there is a constitutionally mandated element of any crime that punishes pure speech like Section 871. Can I interrupt for a minute? The Supreme Court currently has a threat case. Is there any reason we should wait for that? No, Your Honor. The case United States v. Ilonis was argued. We are awaiting a decision. That case involves 18 U.S.C. Section 875. It is possible. Certainly, the question of whether there is a subjective intent mandate in the First Amendment is a central issue in that case. However, the statute 875 is different from 871. 871 has language requiring knowing and willful as a mens rea. 875 has no mens rea. It is possible that somewhere down the line, probably years from now, if there is a holding in Ilonis that says subjective intent is not required, it will trickle down and affect 871. But it's far outside the realm where it would be appropriate to wait in this case. I filed a 28J letter that cited a case in the Tenth Circuit called Wheeler in which the Tenth Circuit addressed that question also in reference to Ilonis and said for that reason, they didn't want to wait to see what happened in Ilonis. And that certainly applies here as well. I would also note that 871 may relate to some legislative history cited in the Gordon case, which cites 879. I know this is getting confusing, but there is legislative history referring to subjective intent requirement from Congress in reference to 879. The same legislation amended 871. That may relate to a reason to make a special, to have a distinction between 871 and 875. Now, in this trial, as I said, there was a recording in which Mr. Harrison said multiple times to police officers and very clearly, I'm going to kill the president in two days. And two juries refused to convict him on any counts. There wasn't a dispute about what he said or that he intended the officers to hear what he said. The only real question in dispute and what presumably was hanging up those two juries was whether the intent requirement was proven. The intent elements, objective intent and subjective intent, were proven. And the pattern of argument the defense made was who would take him seriously under these circumstances, that's objective intent. And did he really mean to be taken seriously? There were plenty of reasons in the record not to conclude that he intended to be taken seriously because even though he said those things, he also said silly things and ridiculous things and things that turned out to be wrong. He talked about pens that look like bullet shells as guns. He said the blank is mightier than the blank. He said he robbed a bank and then explained a story about taking a lollipop on his way out. There were many reasons for juries to conclude that he didn't intend to be taken seriously, but the prosecutor said or that he was just a weird, crazy guy. Or he perhaps is an eccentric individual. But at that point, how you decide what he intends to be taken seriously is a little quirky. Well, exactly. And I think, you know, it's reasonable to conclude based on those two mistrials that the jury concluded something along the lines of he's quirky, but he didn't intend to be taken seriously as someone who wanted to harm the President. Can you cite any authority that permits us to infer why the jury came to a certain verdict or did not in the first two trials? Off the top of my head, I can't. If I can find something, I'll file something supplemental with the court. But it does seem like a circumstantial fact that is pertinent to the question of prejudice. In the Cegna case, which I do rely upon significantly in my briefs, this court found that it was plain error when a misstatement of the legal standard was made by the prosecutor in closing argument. And the standard that they applied was essentially a material – The other two trials were about all of the charges. Is that right? That's correct. Well – And then one fell out of the second trial because they had been acquitted of it. But other than that – That's right. That's right. There were more charges in the first two trials. I mean, one possibility is just by focusing the case, they were able to do better. Certainly that's a possibility. Let me ask you this. I mean, sometimes when I'm speaking to my children, I'll say, did you hear me? Did you hear me? Now, I'm not talking about did the sound pass through their ear canal and however that works. I'm talking about – you understand what I'm saying? When the prosecutor described the elements in that fashion, why isn't it equally  not hear as it sound into the ears, but that they got that he really wanted to kill the President? Your Honor, I'm not alleging bad faith, and I will not reject the idea that that may have been what the prosecutor intended. And I could conclude based on this record, A, the prosecutor didn't really understand the subjective intent element, or B, what you say. She thought this was an appropriate way to say it. Well, he did repeat it properly at least a couple of times, right? A couple of times she made statements that were more consistent with the actual standard. By the way, was it the same prosecutor? The – it was not the same prosecutor who did the closing. So she may just have different speech habits. That's true. But even without bad faith, and even if that was her reasonable intention, the fact is the jury was given these statements, four different statements in the closing argument, to the effect that he intended the listener to hear it was what it really meant. The first one is on page 382 of the excerpts. The defendant intended that his statement be taken as a threat. He intended the listener to hear it, so he intended the listener to hear that he was threatening to kill her for injuring the President. That's what that has to do with. It seems to be conveying the idea to the jury, who, of course, are not First Amendment scholars and haven't read Bagdasarian, presumably, and all these other cases, to understand the subtleties, that that's a gimme. That's really not a significant element. It just means he intended to be heard, which no one disputed. On page 388, again, the defendant intended to threaten to kill the President, intended his listener to hear it, and any reasonable person would have come to the same conclusion. The last part, of course, is the objective version. And then on page 404, I'm sorry, 403 to 404, there's another reference. This is a case about words. It's a case about the expression of an intent, an intent to threaten to kill the President, an intention to have the listener hear it. And then, finally, the very last thing that she says in her rebuttal, right before the jury goes off to deliberate, the defendant threatened to kill the President, he intended to do it, he intended his listener to hear it, and any reasonable person, and so she goes on to the objective. So with those multiple instances of suggesting to the jury by that verbiage that the the she's got she's got four sentences there, four very short sentences, and she two of them end in it. And there's some ambiguity here as to what the it refers to, isn't there? He intended to do it, that is, to kill the President. That would be the subjective intent. But it was predicated by saying he threatened to kill the President. He intended to do it, that is, to kill the President. He intended his listener to hear it, meaning his threat to kill the President, as a legitimate threat to kill the President. I mean, that's, I have to say, it's not a powerful misstatement if it's a misstatement. Well. It's not much. And you did get correct instructions, and you and you didn't object, so. Well, that's true, Your Honor. The instructions, unfortunately, the instructions, and this is this is the model instruction, the instructions were given under the model, and it's for the subjective intent element, it said the defendant intended that the written or oral statement be taken as a threat. Now, to us who understand true threat doctrine and have written or read this Court's taken as a threat means taken as a serious expression of an intent to harm the President. But to lay jurors be taken as a threat, I don't think that necessarily means anything. So are you contending that the model instruction is infirm? I'm suggesting that in this case, the model instruction is not good enough to overcome the misleading nature of those statements in the closing argument. I do think the model instruction can be better, but I admit I'm not challenging that misappeal. No, I mean, one of the interesting facts in this case is that several people obviously did take it seriously. They called the Secret Service, they called the police, and so on. I understand that that's not the subjective element, but it certainly seems to me to be some evidence regarding the subjective evidence element. True, and I'm not, I have not argued that there was insufficient evidence to convict, including on the subjective intent element. I'm simply arguing that in light of the evidence in this case, these misstatements in the closing argument could have made a difference and possibly factored into the third trial and the first two trials. Are we here on plain evidence? Plain error on this claim, yes, it's plain error. Yeah. And the error was not plain to you or to a trial counsel, but it should have been plain to the district judge? As in Cegna, there was no objection there. Right, but that's all, I mean, that's the complexity in a plain error argument is it should have been plain to the district judge, but it wasn't plain to me. I acknowledge that. I do think that there is case law, including the Cegna case, in which the Court has found plain error in similar circumstances. You want to talk about the 404B issue? Yeah. The 404B, you know, Your Honor referred to the fact that there are many more counts in the first two trials involved, those other counts, despite the fact that those had either been acquitted or dismissed by the time of the third trial, much of that Mr. Harrison had posted with some fairly colorful language talking about, President, I'll have your head on a spike, et cetera, et cetera. Now, there were extensive written objections to those and oral arguments about those. So what was the explanation as to why those made the knowledge and willfulness more pertinent to knowledge and willfulness? Is your argument that it wasn't pertinent to knowledge and willfulness or is it a 403? What exactly is your argument? My argument is that, as it was argued below, it should not have come in under 404B and 403, that there really wasn't significant probative value to be added. Mr. Harrison, I think that part of the rationale the Court followed was, well, he did tell people, go look me up on the Internet, and that leads them to the Facebook page and then the Facebook page. So there's a causal connection. But does that mean probative value? I don't believe it does. It's really just more of the same, except a little more colorful. And so — But he didn't tell them to go look at the Facebook page and the fact that what's on the Facebook page is part of the substance of the threat, no? I would respectfully disagree with that. I mean, what he was charged with was one oral statement he made to a teenager and another oral statement he made to a police officer. Which included, go look me up on the Internet, go Google me or something. He said to the teenager something about looking him up on the Internet. So it seems to me the Facebook page stuff is part of what he said. Yes. I mean, Counsel, if I tell someone, you don't believe me, look me up on the Internet I'm a judge. Well, then that would seem to be all part of the same, because people probably don't believe I am. But if you put it all together, it's all part of the same conduct. It's almost like an intertwined, I'm not even sure it really qualifies as true 404B. So what's wrong with that look at the case? Well, the statements were not made at the same time or near the same time. And they're made in very different formats. I mean, these are things he put several days earlier he'd put up on a Facebook page. And that doesn't seem like a 404B problem. The other one, to me, the other one, which was the statement made to the guy at the bar, as to when she was acquitted, right? Yes. It doesn't have that character. It doesn't have that. Well, it kind of does, because it's what led them to the police, right? It has a causal connection, again, which I think was part of the rationale the Court gave. It has a causal connection. It's why the police went to see him to begin with. That's correct. I see. I would like to try to save the balance of my time. Thank you. Good morning. May it please the Court, my name is Ray Wu for the United States. I'd like to address the first question before the Court of whether the government committed error in closing argument. I respectfully submit to the Court that the government did not commit error. At the very onset of closing argument, the government stated to the jury that the defendant, for the second element, the defendant intended that the statement be taken as a threat. He intended the listener to hear it. So he intended the listener to hear that he was threatening to kill or to injure the President. I would submit to the Court that was a correct statement of the law. Following that statement on page 383, the government then stated to the jury, in this case, did he intentionally threaten to injure or kill the President and intend for the listener to hear it as such. By stating to hear it as such, again, I would submit to the Court that that is the correct statement of the law. After that statement on page 383, the government then stated to the jury, did he intentionally  The government made a factual argument to the jury that was tailored appropriately to the correct elements of the offense. The government pointed out to the jury that the defendant, in speaking to the witnesses, would point out that he's a killer, that he's killed before. He would tell the jury – I mean, tell the witnesses that he's gone to jail. There would be a seriousness in his voice and tone when he described his threat to kill the President. And he also said a bunch of crazy things to police the police. Well, if I may address that, Your Honor. He did, in fact, say a bunch of crazy things to the police. He talked about robbing a bank to get a lollipop. He talked a couple of other things. But I think the police witnesses explained to the jury why they believed the statements about the President were very serious. And I think this is reflected in Exhibit 48, which the Court has a copy of. That's an audio recording. And there in Exhibit 48, you can hear the defendant's emotional motive as to why he was threatening to kill the President. He talked about the rape of this girl that he knew in his hometown. He talked about this rapist as a monster. He talked about how that the President has the resources to locate this man. Did they ever ask him how he was going to get to Washington to kill the President in two days? I'm sorry. Your question is did they ask him how he was going to do it or what? Well, I mean, it's an extremely improbable thing that this guy who was wherever he was was going to get himself to Washington, or I don't even know, assuming that that's where the President is, and get himself to kill the President in two days. Yes, Your Honor, and I agree with you. I agree with your statement. So maybe somebody had asked him that and it would have become a little clearer that it wasn't so serious. And I think that's why this case was charged as a threat case instead of an attempted assassination case. I'm sorry. What? This case was ultimately charged as a threat case instead of an attempted assassination case for that very reason. But as you can hear in Exhibit 48. I know, but it goes to the seriousness of the threat of whether he really believed anybody was going to believe it was a threat. Yes, Your Honor. That type of evidence would go to the seriousness of the threat. I agree with you. Yes. But back to Exhibit 48, as described by Sergeant Warden and Officer McDurbin, in describing this particular event of the rape and the threat to kill the President, the defendant became very emotional. His jaw was clenched, as described by the witness. I guess the hard question here is how do you tell whether somebody who seems kind of nuts, actually, intends, seriously intends somebody to believe him? I mean, it's a very difficult question, really. I mean, if somebody says, you know, I'm going to fly over the White House and sprinkle fairy dust, and the question is, you know, does he seriously want somebody to believe that, you have to know something about his state of mind and how crazy he is, I guess. And you can say, well, he's so crazy he would believe, get somebody to believe he would expect somebody to believe that. And that's sort of what you're saying here, isn't it? Well, no, Your Honor, because what I'm saying to the Court is that in light of the case in its entirety, if you look at the Facebook threats, the multiple threats to different witnesses, the explanation of this emotional motive involving the rape of the girl and why he wants to threaten to kill the President, and the fact that many of these witnesses, after seeing the defendant, hearing the motive. But if you were the police and you wanted to know whether he was serious, did they ask him how he was going to kill the President? Did they ask him how he was going to get there to kill the President? Did they ask him anything that would give any substance to this notion that he's really going to think that he's trying to persuade these people that he's going to kill the President in two days? Well, I mean, I think they, if you listen to Exhibit 48, they did, in fact, ask the defendant how the President would know of his threats. And in that. How the President would what? I'm sorry, Your Honor. How the President would know of the fact that he wants the President to find this rapist is what they asked him in that particular exchange. And in that particular exchange, in Exhibit 48, the defendant asked Sergeant Worden, have you seen my Facebook? And Sergeant Worden said no. And the defendant stated, well, I've threatened the President's life on Facebook in that particular exchange. But doesn't this – there's a serious – I understand he doesn't have to actually intend to do this, but doesn't he have to intend the people to think he's going to do it? Yes, Your Honor. Right. So the question is – that's why I'm asking you the questions. I understand that they can – that he can – they ascertained whether he meant the President to hear the threat. But did they make any attempt to find out whether there was anything serious about this threat? Based on the record of trial, I don't believe the witnesses from Gilbert Police Department were asked if they asked the defendant how he intended to carry out his threat. He was turned over the – Maybe they have no obligation to, but it seems to me to make it difficult to tell whether – what this guy really intended them to believe because it's kind of facially improbable. But, Counsel, the Secret Service investigates threats on the President, correct? That is correct, Your Honor. And the police referred this gentleman to the Secret Service. Isn't that right? That is correct. So it wouldn't normally be for a local sheriff to investigate threats against the President. You would refer that to the agency that's in charge of doing that. That is correct, Your Honor. Justice Breyer, back to your question. I completely understand the Court's concerns about the protection of free speech and issues related to that. Ultimately – You know, it's balanced off against people who are – don't think the way other people do. I think there's a large range of different conduct. On the extreme range, you have the ultimate assassination. Then you have individuals who will take steps to carry out the assassination. And ultimately, you have the criminalization of threats, people who will intentionally make a threat. And I think the jury instruction in this case reflects that. It makes an attempt to set forth elements to define what a true threat is. And in this particular case, this is simply a threat case. And as presented to the jury, the defendant was – the evidence to show that the defendant intended to make a threat and intended the listener to hear it as such was based on his demeanor, the fact that he would tell witnesses specifically, I've been to jail, look me up, look me up on the Internet, which ultimately led to the Facebook post, which were very inflammatory. The Facebook post talked about, Washington, I'm coming for you, blood will be spilled. And this is on February 7th of 2013. In the next sentence, the defendant wrote, and yes, my previous comment was and is and will be a threat against an American-standing president. In the second Facebook post, which was posted on February 8th, the defendant made specific references to that rapist. He talks about, President Obama, bring me the head of the man who defiled one of God's daughters, or else I will – I'm sorry. And I will pardon you, your wife, and your daughter's lives. Or else I will have your head in a spike, I will witness your wife downtrodden, I will share my home with your beautiful, innocent daughters. And then again, on February 9th, he posts another Facebook post. In light of all those circumstances, I would submit to the Court that it – that there was evidence to prove that the defendant intended that his statements to be taken or heard as a threat. Ginsburg. What about the 404b? Yes, Your Honor. My concern may not be appropriate in light of the case law, but he was acquitted of two accounts that were actually presented to the jury as prior. And I understand that you can do that because the standard of proof as to whether those things happened is different, right? It's providers. Yes, Your Honor. But was the – the problem is the word threat, right? In other words, was the jury told that as to those incidents, they had to at least find by a preponderance that there was a threat in the sense of the statute? No, Your Honor. The jury was not instructed that they would have to find that those statements were – would qualify as a threat. Isn't that awfully, at least, mushy in terms of what the jury's takeaway may have been, especially because they didn't know he was acquitted of this stuff? Well, Your Honor, I think the court actually told the jury the opposite, that they could not – well, I think the court was very specific about this and careful about this as well. At every time, at each instance when the government presented the Facebook threats and the statements made to Mr. Burdett, the court carefully instructed the jury that the government had not charged the defendant with a crime here and that they should not – But how could it be pertinent to knowledge and intent unless it was itself a threat, at least by a preponderance? Yes, Your Honor. The statements on Facebook were highly relevant to intent for a couple of reasons. One, in terms of time. Even if one assumes that he didn't seriously intend them? In other words, didn't – do you see what I'm saying? Yes, Your Honor. In other words, doesn't – didn't the jury have to first think that these were seriously intended, even though by a lower standard of proof, in order for them to be relevant? No, Your Honor. I disagree with that. I think that in order for this to be relevant, it just has to be statements made by the defendant and evidence of either his intent, motive, or – Okay. But why is it, if they were – if they themselves were not subjectively intended threats? Well, I think you can look at the content of the statement itself to see if the content itself would support the inference that the defendant possessed the requisite intent to make a threat. But if what I'm saying is, was the jury ever told with regard to those statements that it had to find first that there was such an intent, even though they didn't have to find it beyond a reasonable doubt? Am I right that that's true, that without – if they weren't threats in the statutory constitutional sense, they wouldn't have been pertinent? No, I disagree with that, Your Honor. I think that – All right. Well, then tell me why, because you just said something different.  I think that the jury need not have found that these were, in fact, threats. They could just look at the content of the statements to see if the content of the statements would ultimately support the argument that the defendant did, in fact, possess the requisite intent – This time. Right. To make a threat against the President. And I think you have to look at the timing. The Facebook post happens – Even if he didn't that time? Yes, Your Honor. That's correct. I think you can just look at, again, at the content. And I think the Court was very careful in making sure that the jury was not mistaken in believing that these were, in fact, threats. So, for example, in –  those as threats. But he wasn't – he didn't tell them that these were pertinent even if they weren't threats or that they had to be threats. That is true. All right. Tell me how they're pertinent if they're not threats. Okay. Yes, Your Honor. For example, the Facebook threat that's happened two or three days before the defendant made verbal statements to threaten to kill the President. These statements themselves were inflammatory. They were directed at the President. They talked about harming the President, President Obama and his family. And there is a – basically an admission there that these statements are, in fact, a threat against the President. I would submit to the Court that because he posted these inflammatory statements about the President, about harming the President, days before he made a verbal threat to kill the President to witnesses, this is evidence of his intent. The Facebook posts are also evidence of his motive, because in the second Facebook post, the defendant directly talks about the rapist and his request that the President bring him the head of the rapist or else he won't – in order for him to pardon him. Well, why does saying the same thing twice make it more likely that he meant to tell you something about his knowledge and willfulness the second time? Well, I think in a particular case like this where subjective intent – and there's multiple levels of subjective intent – is such a critical issue, I think other act evidence that would tend to support what that subjective intent is, is very relevant. Probably why? I mean, you're not – I mean, if he said the same thing five times, why does that make – tell you anything more about what he – what his knowledge and willfulness was with regard to how other people would understand it? Well, I think ultimately there's recognition that it's – people can't read minds. It's hard to find – I'm sorry, what? People cannot read minds. It's hard to figure out what someone's true subjective intent is without looking at the circumstances in which the statements were delivered or the manner in which the statements were delivered. May I take, Mr. Wu, your point is that if someone were to say something like this, I'm going to kill the President, and someone said, do you believe that – do you think he's joking? Someone could say, I don't think so, that's what he told me yesterday. I think that's the point you're making. That is correct. Okay. And on top of that, in addition to that, Your Honor, in this particular case, the defendant would tell these civilian witnesses, look me up on the Internet, Google me. And this would ultimately – ultimately lead back to the statements on Facebook. And I think the statements on Facebook as well as statements to Mr. Burdett. But that would suggest it's just not 404B evidence at all. It's part of the same threat. Well, I think there's an argument that it would be inextricably intertwined to everything. I don't know if it would be part of the same threat. I think the final point I'd like to make about the 404B evidence is that the fact that he made these statements before on Facebook and that he made similar statements to Mr. Burdett demonstrates that there was a lack of mistake by the defendant when he made the threat to the two minors, CP and MR, and when he made the threat to kill President Obama, to Officer McDermott. With that, my time is up. I would ask the Court to affirm the judgment. Thank you. Thank you, counsel. We have a couple of minutes for rebuttal. There were a couple of places where the prosecutor in the closing made – used the verbiage as such. I would simply submit that saying as such is not very helpful if you've already made this representation several times that it just has to be an intent to hear it. As such doesn't inherently add anything unless it's referring to a such that is meaningful, and it's not in this case. Judge Berzon, you asked whether the police asked him how do you intend to kill the President. Not only did they not ask that in the recordings that were played at trial, but to the contrary, one of the officers asked, why should we take you seriously? You know, you talk in riddles, you say one thing and then it means another thing. You talk about robbing a bank, but it's just a lollipop. So really, the evidence, again, was – Well, except that he asked that in order to get – and then the guy – didn't he say, because I'm really going to do it? He said – he said, why wouldn't we want to take you seriously? Right, and the response was – The response was, you shouldn't, and then perhaps I am. And that was the supplement I just filed. So the grammar is quite confusing there, but it seems like grammatically he's first saying you shouldn't take me seriously, and then maybe he said I am, you should take me seriously. So it's – it just – to me, it looks like more strange, conflicting messages. As far as it – There was never an insanity defense here or anything like it, right? Was the basic defense this guy is kind of crazy and nobody would believe him? The basic defense was, you know, this guy has a very unusual way of trying to get across a message about truth, understanding, right, and freedom, which is what you see if you Google his name and pull up his Facebook, the public version of his Facebook page. That was – that was the – that was the argument. You know, it's a shocking and unusual way to express a message and to direct people to what he thinks is important. Not that he had mental health problems. I don't believe to the jury it was argued he had mental health problems. There was some briefing in the district court relating to sentencing, I believe, that said there had been some issue about mental health problems. As far as the other – the Facebook being the same threat, I think there would be double jeopardy issues with them having initially charged them as separate counts, if that were the case. No, because it had additional elements, additional facts. Okay. Well, I could be wrong. But they were charged as separate crimes in the original indictment. And so at least the government felt that they were separate threats at that time. If there are no further questions. Thank you. Thank you very much. Thank you. Counsel both. The case of United States v. Harrison is submitted, and we will take a short break.
judges: Berzon, Bybee, Owens